**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 07-5116**

_____

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

     v.

ERIC PRESTON HANS,

                Defendant - Appellant.

_____

Appeal from the United States District Court for the District of
South Carolina, at Greenville.  Henry M. Herlong, Jr., District
Judge.  (6:05-cr-01227-HMH-1)

_____

Argued:  March 25, 2009            Decided:  May 29, 2009

_____

Before DUNCAN, Circuit Judge, Robert J. CONRAD, Jr., Chief
United States District Judge for the Western District of North
Carolina, sitting by designation, and Thomas D. SCHROEDER,
United States District Judge for the Middle District of North
Carolina, sitting by designation.

_____

Affirmed by unpublished opinion.  Judge Conrad wrote the
opinion, in which Judge Duncan and Judge Schroeder joined.

_____

**ARGUED:** Benjamin Thomas Stepp, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Greenville, South Carolina; Richard Walter Vieth,
HENDERSON, BRANDT & VIETH, Spartanburg, South Carolina, for
Appellant.  Robert Frank Daley, Jr., OFFICE OF THE UNITED STATES
ATTORNEY, Columbia, South Carolina, for Appellee.  **ON BRIEF:** W.
Walter Wilkins, United States Attorney, Columbia, South
Carolina, Regan A. Pendleton, Assistant United States Attorney,

OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

CONRAD, Chief District Judge:

On November 16, 2005, a grand jury for the District of South Carolina returned a one-count indictment against Eric Preston Hans. The indictment charged Hans with maliciously damaging and destroying, and attempting to damage and destroy, by means of fire, the Comfort Inn and Suites at 831 Congaree Road in Greenville, South Carolina, a building used in interstate commerce, resulting in the death of six individuals and in bodily injury to eleven individuals. For this 18 U.S.C. § 844(i) violation, the Government sought the death penalty.

The case went to trial on July 23, 2007. On August 2, 2007, the jury returned a guilty verdict. The jury was unable to reach a unanimous verdict as to a sentence.

On October 25, 2007, the district court sentenced Hans to life in prison and the court entered judgment on October 29, 2007. Hans timely appealed his sentence and conviction. We hold that the district court did not violate Hans's Sixth Amendment Rights, nor did the court abuse its discretion when it denied Hans's motion for a mistrial. Further, we hold that the Government presented sufficient evidence at trial to support

3

Hans's conviction.     We   therefore   affirm   the   district   court's decision.


I. Relevant Facts

A. The Fire

On January 25, 2004, at approximately 4:22 a.m., the desk clerk at the Comfort Inn and Suites at 831 Congaree Road, Greenville, South Carolina (the "Comfort Inn") made a 9-1-1 call reporting a fire at the hotel.  Approximately four minutes after the first 9-1-1 call, Fire Engine 2 from Wade Hampton Fire Department arrived on the scene.   The firemen immediately reported rolling flames and heavy smoke at the north exit door of the third floor of the hotel, a five floor building.   The third floor exit door opens to the ground level at the back of the Comfort Inn.[1]   According to the first firefighter on the scene, flames were coming out of the top of the door and rising upward about two feet.

---

[1]On the evening of the fire, the security access to the hotel through the third floor exit door was not working, so anyone could enter that door.

The firemen suppressed the fire within several minutes. The Greenville County Sheriff's Office Deputies joined the firemen and assisted with the rescue of hotel guests.

The firemen reported that the area outside the rear third floor door was littered with cardboard and Styrofoam packing material. There was extensive fire damage in the area around the door and nearby hallways. Investigators determined that no accelerant was used, so the only way the extreme heat patterns could have been produced was by a person placing combustible materials (i.e., the cardboard boxes and Styrofoam) in the foyer area and igniting them with a direct flame. A stack of cardboard boxes inside the foyer had burned from the top down and was still smoldering during the initial stages of the investigation. Investigators concluded that arson caused the fire, and that the fire was likely started between 4:05 a.m. and 4:10 a.m. on January 25, 2004.

B. Relationship between Cromer and Canty

As the investigation continued, law enforcement officers learned that one of the deceased victims of the fire, Melba Canty, and a surviving victim, Zachery Cromer, had a turbulent relationship. Cromer and Canty had a sixteen-month old son,

5

who, along with Canty, died in the fire at the Comfort Inn. Further, investigators found that Canty was friends with the appellant, Hans, and that Hans and Cromer held significant animosity toward each other in relation to Cromer's treatment of Canty. Cromer believed that Hans was extremely jealous of Cromer's relationship with Canty and that Hans continually interfered in their lives. Cromer told law enforcement that his house was broken into a few months prior to the fire, and that Hans taunted him on the phone about being the one who committed the burglary.

A couple of weeks before the fire, Canty needed a place to stay and went to live with Hans. The week prior to the fire, while Canty was living with Hans, the situation between Hans and Cromer escalated with numerous belligerent phone calls back and forth.

According to Cromer, he and Canty decided that they needed to spend some time together with their son to try and mend their relationship. On January 24, 2004, at approximately 10:30 p.m.,

a few hours before the fire, Hans rented a third floor room for one week for Canty and her son at the Comfort Inn.

Later that same evening, Cromer arrived at the Comfort Inn.[2] After Cromer's arrival, he and Hans argued on the phone. Cromer told Hans that he and Canty were back together and that Hans could do nothing to change that. Cromer testified that after telling Hans that he and Canty were back together, Hans replied, "she's not going to stay up there with you. I'll make sure of it." (J.A. 367). Telephone records confirm that Hans and Cromer exchanged sixty-six phone calls on January 24. Cromer acknowledged that during some of these calls he taunted Hans about Canty.

Witnesses later verified that Cromer left the room around 2:00 a.m. on the morning of January 25th, and rode with two friends to a nearby Waffle House to get take-out food to bring back to Canty. Cromer returned to the Comfort Inn with the food. Cromer reported that there were no boxes or debris on the

---

[2]As part of their effort to mend their relationship, Canty agreed to stop spending time with Hans, and Cromer agreed to stop spending time with one of his female friends.

steps or in the walkway at the time but that there may have been some boxes stacked next to the rear exit door. Cromer and Canty then went to sleep and were later awakened by the fire alarms. Cromer survived the fire, but Canty, her son, and four other individuals died in the fire.

## C. After the Fire

Shortly after the fire, investigators located Hans at the Crowne Plaza Hotel, which is next to the Comfort Inn. Hans waived his Miranda rights and agreed to be interviewed. In his statement to the police, he claimed the following:

- After he checked Canty in at the Comfort Inn, he went to Platinum Plus, a nearby strip club.[3]

- He later left Platinum Plus, went home, and fell asleep.

- After receiving a call from a friend, he returned to Platinum Plus.

- He stayed at Platinum Plus until around 3:30 a.m.

- He then attempted to go to a nearby storage unit to drop some things off but could not get there because a police car was blocking the road.

---

[3]Platinum Plus strip club was only .9 miles from the Comfort Inn and Hans was a regular patron at both.

- Next, he went back to Platinum Plus; on his way there, he saw that the Comfort Inn was on fire.

- He stayed at Platinum Plus a few minutes before going back to the storage unit; this time he was able to get through.

Hans's statements to police were contradicted by video footage from Platinum Plus showing that Hans left Platinum Plus at 4:01 a.m. Fire investigators estimated that someone started the fire between 4:05 a.m. and 4:10 a.m. Video footage from a Lowe's parking lot camera across the street from the Comfort Inn showed Hans driving through the parking lot at 4:15 a.m. Video footage from the BP gas station camera, also across the street from the Comfort Inn, showed Hans making a purchase from 4:22 to 4:23 a.m. The Comfort Inn records showed the fire being called in at 4:22 a.m. and the 9-1-1 records showed the call about the fire being received at 4:24 a.m. Video footage from Platinum Plus showed Hans arriving in the parking lot again at 4:29 a.m. and walking into the building at 4:31 a.m. Upon returning to Platinum Plus at 4:31 a.m., Hans told several individuals that he had not gone home because the Comfort Inn was on fire and

9

there was a roadblock.[4]  According to police records, the first roadblock was set up at 4:32 a.m., after Hans returned to Platinum Plus.  Numerous witnesses testified that Hans was not concerned about the fire, even though he knew that Canty and her son were staying at the hotel. Platinum Plus video footage showed Hans leaving again at 4:55 a.m.  The records at the storage unit show that he checked into his storage unit at 5:03 a.m.

In July 2007 the case was tried capitally.  During jury selection, Hans sought to disqualify four jurors, because, he claimed, they were biased.  The district court refused to disqualify them.  Hans then used his peremptory challenges to disqualify these jurors.  The district court *sua sponte* disqualified another juror for bias.

At trial, Canty's aunt, Rolissa Jordan, testified that Hans told her after the fire that the last thing Canty told Hans was that she and Hans could no longer be friends because Canty was

---

[4]The government introduced evidence that Hans would have headed in a direction away from the roadblock and the Comfort Inn if, as he told his friends, he intended to head home after leaving Platinum Plus.

going back to Cromer. Jordan testified that Canty, in a similar vein, also told Jordan that she was going back to Cromer. Hans's housemate, Rodney Babb testified at trial that the day after the fire Hans said either "I did something bad" or "Something bad happened." (J.A. 997). These statements differed from the statement Babb gave police earlier, at which time Babb only said that Hans said "I done something really bad."[5] The prosecutor later impeached Babb with his prior inconsistent statements to the police. Additionally, Curtis Kricke, an inmate incarcerated with Hans on an unrelated charge in December 2005, testified that Hans told Kricke that he, Hans, started the fire at the Comfort Inn.[6]

---

[5]Previously, Hans's housemates, Rodney Babb and Jill LeGreca, told the police that the day after the fire Hans stated, "I've done something really bad." Hans also stated that he could not tell Babb about it because Babb had a baby. (J.A. 995-1003; 1017; 1271). Babb became scared and called the police in the middle of the night to report this statement. Babb and LeGreca stayed that night at Babb's parent's house.

[6]Although some of the details of Kricke's testimony did not match the actual incident (e.g., Kricke stated that Hans claimed to have used an accelerant to start the fire), the account of the confession and the inconsistencies were put before the jury.

During trial one of the prosecutors asked about an "unrelated" criminal investigation in which Hans was involved. Hans objected that the evidence was prejudicial and moved for a mistrial. The district court sustained the objection, but denied the motion for mistrial. The court gave a curative instruction.

On August 2, 2007, the jury returned a guilty verdict. On August 10, 2007, the sentencing phase of Hans's trial ended with the jury unable to reach a unanimous verdict on the imposition of the death penalty. On October 25, 2007, the district court sentenced Hans to life in prison. Hans timely appealed, raising three issues: 1) whether the jury selection process violated Hans's Sixth Amendment rights; 2) whether the mention of Hans's unrelated criminal activity warranted a mistrial; and 3) whether the Government presented sufficient evidence for Hans's conviction. We address each in turn.

## II. Hans's Right to an Impartial Jury

Hans contends that the district court committed three errors during jury selection: 1) qualifying four jurors despite their allegedly pro-death penalty responses to certain *voir dire* questions about the death penalty; 2) not granting Hans's motions to excuse these four potential jurors for cause; and 3)

12

dismissing Juror 98 for cause after Juror 98 said that he was ambivalent about whether the Government had the right to take a life. This Court recognizes the district court's crucial role in assessing demeanor and credibility during jury selection. Consequently, we review challenges to the jury selection with great deference to the trial court. Our review is for abuse of discretion. See United States v. Jones, 608 F.2d 1004, 1007 (4th Cir. 1979). Hans's first and second contentions are considered together.

### A. Jurors Removed with Peremptory Challenges

Hans argues that the responses provided by four jurors during *voir dire* reflected bias in favor of the death penalty. Hans requested that each of these potential jurors be removed for cause and the court denied the request. After the court qualified these jurors, Hans struck all four jurors with peremptory challenges. A "trial court's refusal to strike a juror for cause does not affect the right to an impartial jury if the defense in fact strikes the juror with a peremptory challenge." Satcher v. Pruett, 126 F.3d 561, 574 (4th Cir. 1997).

Thus, with respect to these four jurors, Hans's only alleged injury is the loss of his peremptory challenges. Yet, it is well settled that the loss of a peremptory challenge does

13

not violate a defendant's constitutional right to an impartial jury because "peremptory challenges are not of constitutional dimension." Ross v. Oklahoma, 487 U.S. 81, 88 (1988). Therefore, the district court did not violate Hans's Sixth Amendment right to an impartial jury by either the qualification of the four potential jurors or by the denial of the request to strike the jurors for cause.

## B. Dismissal of Juror by the Court

Next, Hans challenges the district court's disqualification of Juror 98. Hans argues that Juror 98's statement during *voir dire* that he was "unsure that the Government had the right to take a life," (J.A. 100), should not have disqualified the juror. Further, he argues that the court created a pro-prosecution jury by dismissing such a juror.

In order to sustain a claim that a jury was not impartial on a question of conviction, a defendant must show that a juror who actually sat on the jury was biased, not that an allegedly impartial juror was improperly dismissed. See id. at 86 ("Any claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat" on the jury). In this case, Hans presents no evidence that the sitting jurors were biased toward the death penalty. Indeed, the jury here did not sentence Hans

14

to death.[7]  The trial court's dismissal of Juror 98 did not violate Hans's Sixth Amendment right to an impartial jury.

### III. Hans's Motion for a Mistrial

Hans next contends that the trial court erred in denying his motion for mistrial after the Government presented prejudicial testimony of possible unrelated criminal activity.

At the end of the second day of its case, the Government called Investigator Mark Justice of the Greer Police Department who testified that he obtained a search warrant for Hans's residence and seized items from the residence.  The search warrant was in an unrelated case.  The Greer Police Department

---

[7]The Supreme Court in Bumper v. North Carolina, upheld the imposition of life in prison despite the contention that the court dismissed jurors with hesitations about the death penalty and found that the "decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment."  391 U.S. 543, 545 (1968).  The Court reiterated this distinction in Morgan v. Illinois, reversing a death sentence based on inadequate *voir dire*, but noting that this decision had "no bearing on the validity of petitioner's conviction." 504 U.S. 719, 739 n.11 (1992); see also Gray v. Mississippi, 481 U.S. 648, 650-51, 668 (1987) (observing that the Witherspoon error means "a death sentence imposed by the jury cannot stand," and reversing judgment only "insofar as it imposes the death sentence").

15

turned over some of the seized items to the Bureau of Alcohol, Tobacco, and Firearms ("ATF") for its investigation of the Comfort Inn fire. Hans objected to the Government's questions, which were prefaced by the comments that the search warrant was "completely unrelated to this case" and "[h]ad absolutely nothing to do with this." (J.A. 588-89). He also objected to Investigator Justice's statement that ATF looked through the items and determined that some of the items were "necessary for their investigation." (J.A. 589).

Hans claims that the Government insinuated that he was involved in other criminal activity beyond the accusation of arson through this line of questioning. Upon commencement of the third day of the Government's case, Hans moved for a mistrial based on the questioning by the Government and the testimony of Investigator Justice from the previous afternoon.

The district court agreed with Hans, stating, "[i]t was improper to ask the questions the way they were asked because it did reference possibly another criminal charge against this defendant." (J.A. 602). However, the district court denied the motion for a mistrial, and Hans accepted the district court's offer of a curative instruction in accordance with the guidance of United States v. Martin, 756 F.2d 323 (4th Cir. 1985). See id. at 328 ("Before granting a mistrial, the court should always

16

consider whether the giving of a curative instruction or some alternative less drastic than a mistrial is appropriate.").

We review a trial court's decision to grant or deny a mistrial for abuse of discretion. United States v. Guay, 108 F.3d 545, 552 (4th Cir. 1997). We will only disturb a decision under the most extraordinary of circumstances: a showing of an error that prejudiced the defendant's substantial rights. See United States v. Hayden, 85 F.3d 153, 158 (4th Cir. 1996). In examining possible prejudice, a court must look at the complete record and consider the offending actions in light of the totality of circumstances. United States v. Nyman, 649 F.2d 208, 211-12 (4th Cir. 1980). This Circuit has adopted a three-factor framework to aid this analysis, looking at: (1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the district court's mitigating steps. United States v. Callanan, 450 F.2d 145, 151 (4th Cir. 1971).

The evidence against Hans was substantial. Notwithstanding Hans's argument of a possible alternative arsonist, the case was not close. Ample evidence, including: video footage showing Hans near the Comfort Inn both immediately before and after the fire started, Hans's threatening statements to Cromer before the fire, the time during which Hans was unaccounted for, Hans's statements to his roommates after the fire, his inconsistent

statements to investigators about where he was during that night, and Hans's confession to a cellmate demonstrates the strength of the Government's case.

The second factor also tips in the Government's favor. Considering all of the testimony regarding drug use, drug possession, time at strip clubs, and other generally questionable behavior, the brief mention of a search of Hans's home in an unrelated matter was not central to the question of guilt or Hans's credibility. Hans's credibility was at issue in the timeline he provided police and the Government used surveillance video to show deceit in Hans's statements to the police. The questioning by the Government which implied Hans's possible involvement in other criminal activity was not elicited to show Hans's duplicity; instead, the questions appear to be merely an unpolished attempt to establish a chain of custody for certain items. Lack of intent by the Government does not exonerate it nor would it undo a harm if one existed, but the context of the questioning is important. The Government did not ask the question during a high pressure moment in the trial; it was asked during mundane chain of custody questioning. The Government had already presented evidence of other criminal behavior related to Hans. Hans's credibility and law abiding status were already severely damaged; these passing references

18

to a search warrant in an unrelated matter were not dispositive to any central issue in the case.

Finally, the district court's curative instruction mitigated any possible prejudice caused by the improper questioning. Absent extreme circumstances, we presume that a jury will follow instructions to disregard potentially prejudicial evidence. United States v. Johnson, 114 F.3d 435, 444 (4th Cir. 1997).

The district court agreed that the Government's questions were improper. Yet, the district court reminded counsel that an instruction might bring more attention to the issue than just moving forward. Defense counsel still desired the instruction, and the court provided a well-worded instruction to the jury.[8]

---

[8]The court gave the jury the following curative instruction: "Before the Government calls its next witness I want to advise you that yesterday one of the Government's witnesses, an officer, brought in evidence about a seizure of certain evidence from the defendant pursuant to a search warrant. I believe he was asked questions about was that something to the effect of in another matter. Whatever reference there was, an inference by the question to the officer that the search warrant was pursuant to another matter, you are not to consider that in any way as evidence of guilt as to this defendant." (J.A. 604).

Further, Hans showed no extraordinary circumstances to merit an inquiry into whether the jurors would apply the instruction, and therefore, the curative instruction was appropriate.

The prosecutor's unfortunate reference to a search warrant in an unrelated matter was nonspecific, fleeting, and ultimately harmless. Looking at the record as a whole, the strength of the Government's case, the lack of centrality of the issue of possible other criminal conduct, and the court's curative instruction, we affirm the district court's denial of the motion for mistrial.

## IV. Sufficiency of the Evidence

As his last argument for overturning his conviction, Hans challenges the sufficiency of the evidence presented at trial. Hans argues that the trial court erred in denying his motion for acquittal under a sufficiency of evidence standard.[9] Hans faces a "heavy burden" in contesting the sufficiency of the evidence supporting a jury verdict. United States v. Abuelhawa, 523 F.3d

---

[9]Although Hans argues that a female friend of Cromer's should also have been a suspect, the relevant inquiry is whether there was sufficient evidence to convict Hans.

415, 421 (4th Cir. 2008) (citation omitted). In resolving issues of sufficiency of the evidence, this Court does not weigh evidence or reassess the fact finder's assessment of witness credibility. United States v. Sun, 278 F.3d 302, 313 (4th Cir. 2002). Hans's jury conviction must be sustained if, taking the view most favorable to the Government, there is substantial evidence to support the verdict. Glasser v. United States, 315 U.S. 60, 80 (1942). Substantial evidence is evidence that a rational trier of fact could have found adequate and sufficient to establish the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Reversal is reserved for the rare case where the prosecution's failure to produce such evidence is clear. United States v. Jones, 735 F.2d 785, 791 (4th Cir. 1984).

To sustain a conviction for arson under 18 U.S.C. § 844(i), the Government must prove that a defendant "(1) maliciously; (2) damaged or destroyed a building . . . ; (3) by means of fire . . . ; and (4) the building . . . was used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." United States v. Gullett, 75 F.3d 941, 947 (4th Cir. 1996). Hans does not dispute elements three or four, but instead argues that the evidence was insufficient to establish elements one and two. However, when the evidence is

21

viewed in the light most favorable to the Government, a reasonable jury could find that the Government proved these elements beyond a reasonable doubt. Multiple witnesses testified to Hans's jealousy and that he felt threatened by the likelihood that Cromer and Canty were about to patch up their relationship and resume life together as a family, the result of which would be the end of Hans's friendship with Canty. These witnesses provided evidence of Hans's possible motive in starting the fire: to vent his anger about Cromer and Canty or to prevent the end of his friendship with Canty. Either of these motives provides evidence of Hans's malice.

Further, evidence presented by the Government places Hans at the scene of the crime at the appropriate time. Government evidence, both in the form of testimony and video footage, establishes that Hans was at Platinum Plus Club, a short distance from the Comfort Inn, before the fire and that he left the club at 4:01 a.m. and returned at 4:29 a.m. The Government's fire reconstruction evidence indicated that the fire was intentionally started between 4:05 a.m. and 4:10 a.m. by someone lighting discarded packaging materials found scattered in and around the Comfort Inn. A security video from a gas station across the road from the Comfort Inn showed Hans buying a drink there at 4:22 a.m. From (1) Hans's motive; (2)

22

his presence in the vicinity of the hotel near the time of the fire; (3) the readily available means used to start the fire; and (4) his inculpatory statements to witnesses and his inconsistent statement to law enforcement, a reasonable jury could have concluded that Hans had the opportunity and means to commit the arson.

The Government presented sufficient evidence that the fire was intentionally set and ample evidence of Hans's motive, opportunity, deceit, and remorse. Although most of the Government's evidence was circumstantial, circumstantial evidence, if probative, is enough to convict a defendant.[10] From this cumulative evidence against Hans, a reasonable jury could find that the Government established all the elements of the arson beyond a reasonable doubt. Consequently, Hans's sufficiency of the evidence claim fails.

---

[10]See United States v. Martin, 523 F.3d 281, 289 (4th Cir. 2008) (circumstantial evidence permitted a reasonable jury to conclude that the defendant intentionally set a building ablaze where there was evidence that (1)the fire was intentionally set and evidence of (2) the defendant's financial motive to cause the fire; (3) the defendant's opportunity to set the fire; (4) the defendant's presence alone in the building mere minutes before the fire; and (5) the defendant's lies to investigators).

23

## V. Conclusion

For the reasons stated herein, the judgment of the district court is

AFFIRMED.