REVISED MARCH 19, 2010

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 9, 2010

Charles R. Fulbruge III
Clerk

No. 09-40309

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

TIMOTHY LEE YORK

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before GARWOOD, WIENER, and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

The Government indicted Timothy Lee York (York) on three counts: arson in violation of 18 U.S.C. § 844(f)(1) (count one); carrying a destructive device in relation to a crime of violence contrary to 18 U.S.C. § 924(c)(1)(b) (count two); and possession of a firearm not registered in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861(d) (count three). He was convicted of these offenses following the jury's verdict of guilty on all three counts, and in February 2009 was sentenced to 497 months' imprisonment.

York appeals his conviction and sentence on multiple grounds. First, he argues that the evidence is insufficient to sustain the guilty verdict. Second,

that the trial court erred by overruling his motion for mistrial based on juror misconduct. Third, that inadmissible extrinsic offense evidence was admitted. Fourth, that the trial court erroneously excluded relevant evidence. And fifth, that the sentence imposed was neither procedurally nor substantively reasonable. For the reasons stated below, we affirm York's conviction and sentence.

## BACKGROUND

As Jeremy Carroll and his father-in-law, Walter Vickers, drove home from church on the evening of February 21, 2006, they saw a fire at the Cooke County Courthouse in Gainesville, Texas. It was two to three feet high burning at a courthouse window. At the time, the courthouse was being renovated, so the window where the fire burned had been boarded up with plywood. They stopped their car, called 911, and approached the courthouse. When Carroll saw a broken bottle at the base of the fire, he kicked it away. He testified that after kicking away the bottle, the flames died down somewhat, but continued to burn around the bottle. Vickers testified that he saw liquid inside the bottle. When firefighters arrived, they attempted to put out the fire. The captain of the fire department testified that a Molotov cocktail caused the fire. A chemist for the state conducted a gas chromatography test which revealed gasoline residue in the glass bottle discovered at the courthouse. The firefighters discovered a checkbook at the scene. The Fire Marshal testified the checkbook was somewhat intact after it had been rolled up and used as a wick for the Molotov cocktail.

The checkbook had printed on or in it York's name and address in Irving, Texas. Investigators went to the address, but found that York's parents lived there. York's mother informed investigators that York's father had taken him to Gainesville for a forfeiture hearing. Investigators learned that York stayed at a Ramada Inn, two blocks away from the courthouse, while he was in Gainesville. Using information from his parents, and further investigation into

his activities in Gainesville, investigators discovered that York had moved into a girlfriend's house after staying at the Ramada Inn. The girlfriend gave investigators consent to search her home. They found a duffel bag that belonged to York. It contained an order signed by Texas district judge Janelle Haverkamp for a scheduling conference in a forfeiture suit of York's property. Judge Haverkamp presided over this suit and had chambers in the Cooke County Courthouse. The bag also had in it a document with Judge Haverkamp's home phone number and an incorrect home address for her. Investigators also found in the bag high resolution maps of the home that York apparently believed to be Judge Haverkamp's, a photo of the judge, and notes of research into the security of the courthouse.

York's then-girlfriend, Brenda Finch, also told investigators that York had borrowed her car and driven to Oklahoma, where he was arrested on criminal charges. The Fire Marshal and another agent traveled to Oklahoma to interview York who was in custody there. During the interview, York admitted that he was very angry about a prior forfeiture proceeding against him. Incident to an arrest on July 16, 2005, forfeiture proceedings had been brought by the State of Texas against the York's vehicle and about $865 cash that they found in that vehicle. York admitted that, out of anger, he purchased gasoline, bought a bottle of Jack Daniels Liquor, and created the Molotov cocktail by pouring the gasoline in the bottle and using his checkbook as a wick. York also admitted to lighting the checkbook and throwing this Molotov cocktail against the boarded window at the courthouse. When the investigators questioned York about the information he had about Judge Haverkamp and the courthouse, York became visibly agitated and refused to answer questions.

At trial, York recanted his confession, stating that he only admitted to using the Molotov cocktail because he wanted to get out of Oklahoma state jail. The Government corroborated York's confession with testimony from York's co-

workers and Finch who heard the defendant threaten to blow up the courthouse. In response to the Government's evidence, York called multiple witnesses, including his father and himself. After the Government's rebuttal evidence, instructions and arguments from both sides, the jury found York guilty on all three counts.

## DISCUSSION

### I. Sufficiency of Evidence

York argues that the evidence is legally insufficient on each count. On the arson count, York argues that there is no sufficient evidence that he acted "maliciously" or that a federal nexus for the offense existed. Because the second count is predicated on the arson count, York argues that this court should reverse on the second count too. Finally, he argues that the Government lacked legally sufficient evidence on the third count to prove that York possessed a firearm.

This court reviews de novo a denial of a motion for judgment of acquittal. United States v. Floyd, 343 F.3d 363, 370 (5th Cir. 2003).

> "We will affirm the jury's verdict if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict. Our review of the sufficiency of the evidence does not include a review of the weight of the evidence or of the credibility of the witnesses."

Id. (quoting United States v. Myers, 104 F.3d 76, 78 (5th Cir. 1997)).

### A. Count One

The Government first charged York with violation of 18 U.S.C. § 844(f)(1):

> "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal

financial assistance, shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both."

18 U.S.C. § 844(f)(1).

First, York objects that the evidence does not show that he acted "maliciously" in this respect. We have interpreted maliciously to include wanton and willful burnings without justification or excuse when interpreting 18 U.S.C. § 844(i). United States v. Corona, 108 F.3d 565, 571 (5th Cir. 1997); see also St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency, 556 F.3d 307, 320 (5th Cir. 2009) ("[A]s a matter of statutory interpretation, in determining the meaning of a particular statutory provision, it is helpful to consider the interpretation of other statutory provisions that employ the same or similar language.") (quoting Flowers v. S. Regional Physician Servs. Inc., 247 F.3d 229, 233 n.4 (5th Cir. 2001)). The defendant acts maliciously if he acts in willful disregard of the likelihood of damaging a building. United States v. Monroe, 178 F.3d 304, 307 (5th Cir. 1999). Intent is sufficient, but not necessary. Id.

There is sufficient evidence of York's intent. For example, the Fire Marshal who investigated this fire testified that the evidence clearly suggested that the fire was intentionally set. In United States v. Patel, the First Circuit found sufficient evidence of intent when two fire investigators testified that the fire was intentionally set. 370 F.3d 108, 111–12 (1st Cir. 2004). Some courts have looked at motive as evidence of malice. E.g., United States v. Gardner, 211 F.3d 1049, 1053 (7th Cir. 2000); United States v. Hans, 332 F. App'x 116, 124 (4th Cir. 2009) (unpublished). In this case, the evidence shows that York was very angry at the judge in his prior forfeiture case. York made statements that he intended to kill the judge. He also told several people he wanted to blow up the courthouse. Finally, evidence of preparation for the offense may be evidence of intent. See United States v. Stymiest, 581 F.3d 759, 766–67 (8th Cir. 2009). The Government produced evidence that York knew how to make Molotov

cocktails and had demonstrated making a Molotov cocktail to others. the evidence showed that research related to the security of the courthouse was in York's duffel bag. There was evidence that York had a photograph and the personal address and phone number of the judge in his prior state court forfeiture case. The Fire Marshal testified that York told him that, before he acted, he had made the decision to burn down the Courthouse by throwing a Molotov cocktail.

York also argues that there is not legally sufficient evidence of a federal nexus for the arson count. The statute requires that the damaged building, vehicle, or other personal or real property be in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance. § 844(f)(1). Phyllis Ann Griffin, a county agent for the Texas Agrilife Extension Service, testified that it was her office window that was, in her words, "bomb[ed]" and that her employer receives federal funding. The Fire Marshal testified that there were other offices in the courthouse that received federal funding, including: an adjunct office of the United States Department of Agriculture, County Clerk's office, the District Clerk's office, and the County Auditor's office. He also testified that an Emergency Management office of Homeland Security also has an office in the courthouse. Given that these institutions or organizations receive federal financial assistance, or are a federal agency or department, and possess a part of the damaged building, the Government has put on legally sufficient evidence of the federal nexus.

B. Count Two

Next, York argues that because the predicate offense, count one, arson, was not proven by legally sufficient evidence, the Government has not produced legally sufficient evidence of count two, carrying and using a destructive device during or in relation to a crime of violence. 18 U.S.C. § 924(c)(1), 924(c)(1)(B).

As discussed previously, the Government has produced legally sufficient evidence of the arson count on which the jury convicted York. Arson is a crime of violence.[1] Accordingly, the government has proven the predicate offense to count two.

As count two also requires the use of a destructive device in the commission of the crime of violence, York next argues that there is not legally sufficient evidence that he used or carried a destructive device. 18 U.S.C. § 924(c)(1)(B). The statute defines "destructive device" as:

> "any explosive, incendiary, or poison gas–(i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the preceding clauses."

18 U.S.C. § 921(a)(4)(A).[2] We have interpreted the definition of destructive device under 26 U.S.C. § 5845(f), which uses language identical to that in 18 U.S.C. § 921(a)(4)(A). Under section 5845, we have held that a Molotov cocktail is a destructive device. United States v. Wilson, 546 F.2d 1175, 1177 (5th Cir. 1977); United States v. Ross, 458 F.2d 1144, 1145–46 (5th Cir. 1972). Our interpretation is consistent with that of at least three other circuits. E.g., United States v. Buchanan, 787 F.2d 477, 479 (10th Cir. 1986) (affirming the conviction where a device consisted of a plastic milk container filled with gasoline and charcoal fluid was lit with a fuse made of rags); United States v. Curtis, 520 F.2d 1300, 1304 (1st Cir. 1975); United States v. Cruz, 492 F.2d 217, 219 (2d Cir. 1973) (holding that a Molotov cocktail does constitute a destructive

---

[1] A crime of violence is a felony that has as an element the use or attempted use of physical force against the person or property of another. § 924(c)(1)(D)(3)(A). Arson fits this definition. See also 18 U.S.C. § 3559(c)(2)(B) & (F); U.S.S.G. § 4A1.2(a). York does not argue that arson falls outside the definition of crime of violence.

[2] The definitions in § 921(a) are applicable to Chapter 44 (§§ 921-931) of Title 18. Section 921(a)(3) defines "firearm" to include, among other things, "any destructive device."

device).  See also United States v. Graziano, 616 F. Supp. 2d 350, 362–63 (E.D.N.Y. 2008) (looking at the text of section 921 and surveying the cases from the various circuits to conclude that a Molotov cocktail is a destructive device within the definition of section 921). We hold that a Molotov cocktail falls within the definition of a destructive device under section 921(a)(4)(A) because it is an incendiary bomb.

It is possible to construe York's brief to argue that there is not legally sufficient evidence that York actually possessed a Molotov cocktail.  The record, however, does not support such an argument.  One of the eye witnesses who put out the fire saw the window of the courthouse burning and saw a bottle with liquid in it burning next to it.  He saw paper stuck down in the bottle.  The Fire Marshal concluded that York's checkbook had been rolled up and used as the wick for the Molotov cocktail. A chemist for the Government testified that there was gasoline in the bottle.  The state also put on the record admissions by York that he not only constructed the Molotov cocktail, but how he constructed it. York himself admitted (though he later recanted) that he stuck the checkbook into the bottle filled with gasoline.  York's co-worker testified seeing one of York's Molotov cocktails and that York asked the co-worker to help him blow up the courthouse.

C.  Count Three

Finally, York argues respecting count three only that there is no legally sufficient evidence that he possessed an unregistered firearm.  Section 5861(d) of Title 26 provides that it is "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."  26 U.S.C. § 5861(d).  For purposes of Chapter 53 of the Internal Revenue Code (26 U.S.C. §§ 5801-5872), "firearm" is defined as including, inter alia, a "destructive device."  26 U.S.C. § 5845(a). Section 5845(f) likewise defines a destructive device as, "any explosive, incendiary, or poison gas

(A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device." This is identical to the definition contained in 18 U.S.C. § 921(a)(4)(A). A Molotov cocktail is a destructive device within the definition of section 5845(f), and it is uncontroverted that the device was not registered. Ross, 458 F.2d at 1145–46; Buchanan, 787 F.2d at 479; Curtis, 520 F.2d at 1304; Cruz, 492 F.2d at 219. We reject York's contention that there is insufficient evidence that he possessed an unregistered firearm contrary to section 5861(d).[3]

II. Premature Jury Deliberations

York argues that the trial court erred when it denied his motion for mistrial for jury misconduct. Specifically, he argues that the trial court should have inquired into whether jurors prematurely deliberated at the time (or before) they sent a note asking to see certain evidence. At no time did ever York request to have a hearing or question the jury or any juror about possible deliberations. He simply requested a mistrial. This court reviews the district court's denial of a mistrial based on jury misconduct for an abuse of discretion. United States v. Sharpe, 193 F.3d 852, 861–62 (5th Cir. 1999).

After the Government and the defense had each rested, but before either had closed, the jury was temporarily excused as defense counsel renewed his motion for judgment of acquittal and the Government announced it would have

---

[3] This contention is York's sole attack on the sufficiency of the evidence to support his conviction on count three. He makes no challenge to the jury charge on count three (or on any other count). His sentence on count three was 120 months, all of which was concurrent to his sentence on count one, which was 137 months; his sentence on count two was 360 months, all of which was consecutive to his sentence on count one, as required by 18 U.S.C. § 924(c)(1)(A) & (B)(ii). Concurrent terms of supervised release of three years each on counts one and three and five years on count two were imposed. No fine was imposed. Restitution to the Cooke County Auditor in the amount of $827.08 was ordered. A Special Assessment of $300 ($100 per count of conviction) was ordered. It does not appear that any portion of York's sentence (other than the $100 assessment) depends on his count three conviction. We consider with respect to count three only the contentions that York has raised on appeal.

rebuttal evidence but first wanted to put on a witness out of the presence of the jury to get a ruling on a matter from the district court. While this witness was testifying, and the jury was still out, the note from the jury was received. After a few more questions to the witness who had been testifying and the court having ruled most of the testimony would be admissible, the court called the jury in and asked them concerning the unsigned note, "is this coming from one juror? Is it coming from everyone?" One unidentified juror responded that the note "was something that we had all been interested in." The court then responded as follows:

> "The Court: Okay. And your note says, 'Can we hear a tape of Mr. York's confession to Mr. Henry and Mr. Ward recorded in Oklahoma?
>
> First of all, I don't know if there's a recording of that confession. But you'll have to decide this case based upon the evidence that's presented to you. I don't know if there's a recorded confession.
>
> But when you're deliberating, if there's evidence that you've heard during the course of the trial that you have a disagreement about, then perhaps we can read back some limited testimony to you, if that's a problem.
>
> But you're getting a little ahead of the process here. I'll instruct you on the law at the conclusion of the case, you will hear the final arguments. If at the conclusion of the case you haven't heard a recorded confession, then you can assume there was no recording."

Thereafter, the Government commenced presenting its rebuttal evidence which was not completed when the day ended. The next morning, before the jury was brought in, the defense moved for a mistrial stating,

> "The note yesterday, as I thought about it last night, regarding the request for a tape, it appears to me that the jury has begun deliberations before all of the evidence is closed. I believe that's

improper. And at this time, I would ask the court for a mistrial based on the improper actions of the jury at the time."

The court denied the motion stating, inter alia,

"I took that [the note] as a request from the jury that, if they could have input, they would like to hear that evidence. I didn't take that as an indication that they've already begun to decide the case, but rather that they don't want the case to be completed without having at least made the request for any tape of his statement in Oklahoma. . . . They could agree that they would like to hear something without sharing their feelings about the case yet. And that's the way I took that. So I'm going to deny your motion for mistrial."

The jury was then brought in and the Government continued its rebuttal evidence, and at the end of the day it closed and so also did the defense.

Under the Sixth Amendment, every defendant has the right to trial by an impartial jury. United States v. Dominguez, 226 F.3d 1235, 1243 (11th Cir. 2000). Deliberations prior to the close of evidence threaten that impartiality. Id. Judges have broad discretion to deal with possible jury misconduct. Id. at 1246. "There are often no obviously right or wrong answers to the questions that arise." Id. The trial judge's discretion is broadest when the allegation involves internal misconduct such as premature deliberations, instead of external misconduct such as exposure to media publicity. Id. The trial judge's discretion extends "even to the initial decision of whether to interrogate the jurors." Id. In this case, we hold that the trial court did not abuse its discretion when it denied the motion for mistrial.

York primarily relies upon a distinguishable case from the Third Circuit, United States v. Resko, 3 F.3d 684 (3d Cir. 1993). In Resko, a juror approached a court officer and told him that members of the jury had been discussing the case during their recesses and while waiting in the jury room. Resko, 3 F.3d at 687. Unlike Resko, York only moved for a mistrial; he did not request any

questioning of the jury or any juror. See id. at 687–88. In fact, Resko turns on the fact that the trial court asked the jurors some questions, but decided not to inquire further when those questions revealed ambiguous answers. Id. at 690 ("Simply put, the questionnaire raised more questions than it answered."). Further, the Third Circuit has gone on to recognize that Resko's holding was narrowly limited to the facts of that case, "facts which we thought—and still think—unlikely to recur." United States v. Bertoli, 40 F.3d 1384, 1396 (3d Cir. 1994).

Finally, many of the concerns behind the rule against premature deliberations are simply not applicable to this case. See Resko, 3 F.3d at 689. Resko lists six concerns. Id. First, it is unfair to the defense if jurors prematurely deliberate since the prosecution presents its evidence first and the jury may reach conclusions before the defense has a chance to present its case. Id. Here, the issue came up after the defense rested and before the Government's rebuttal evidence had begun. Second, once a juror expresses his views, he or she is more likely to adhere to that opinion and pay greater attention to evidence that comports with that opinion. Id. In this case, however, the jurors' question tends to indicate that the jurors had not reached any decision on disputed evidence. The jury note was unsigned and asked simply, "Can we hear a tape of Mr. York's confession to Mr. Henry & Mr. Ward?" The Government had presented evidence of the confession in its case-in-chief, but did not play any tape of it. York, through his own testimony, tried to contest or explain that evidence in the defense case-in-chief, but also did not play any tape.[4] Coming after both sides had rested but before either had closed, the note indicated the jury sought more information before the case would ultimately be submitted to them for decision.

---

[4] In fact there apparently was no tape of York's confession to Henry or Ward.

The third rationale the Resko court examined was that "the jury system is meant to involve decisionmaking [sic] as a collective, deliberative process and premature discussions among individual jurors may thwart that goal." Id. This rationale is inapplicable since the record suggests the jury as a whole requested to hear the audio tape. The Resko court also worried that "if premature deliberations occur before the defendant has had an opportunity to present all of his or her evidence . . . the burden of proof will have been, in effect, shifted from the government to the defendant, who has the 'burden of changing by evidence the opinion thus formed.'" Id. This should not concern us because the instant issue arose after the defense rested (and indicated it did not expect to put forth any evidence in response to the Government's forthcoming rebuttal case). Next, the Resko court stated that preventing premature deliberations insured the burden remained on the Government to prove its case beyond a reasonable doubt. Id. at 689–90. Like the previous rationale, this case does not seem to concern any burden shifting. In our opinion, only one of Resko's rationales appears applicable: jurors who prematurely deliberate do so without the benefit of the court's instructions. Resko, 3 F.3d at 689.

Overall, however, we do not believe the trial court committed reversible error. The district court issued some instructions to the jury not to send notes until the trial court issued its final instructions. The defense did not ask for any other instructions. At the beginning of the trial, the district court gave a thorough instruction not to express any opinions before the jurors heard all of the evidence. The law presumes that jurors will understand and follow instructions and abandons that presumption only when there "is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." United States v. Patino-Pardo, 533 F.3d 304, 313 (5th Cir. 2008). Finally, in evaluating a claim of juror misconduct, the law also presumes that the jury is impartial and the

burden rests on the defendant to show otherwise. United States v. Collins, 972 F.2d 1385, 1403 (5th Cir. 1992). At oral argument, York's counsel correctly admitted that, from the record, it is equally likely that the jury had not then begun to deliberate, stating:

> "One juror could have sat down . . . and said, you know, I'd sure like to hear that tape . . . and the rest of the 11 could have said we agree. . . . [O]n the other hand, it's just as likely that they sat down and begun discussing Mr. York's testimony and concluded that they would like to hear that tape to decide whether or not to believe Mr. York. . . . Frankly, we don't know which the scenario was."

Under these circumstances, we hold that York has not met his burden. York never requested the trial court question any of the jurors. He did nothing more than move for a mistrial the next day. Thus, the district court did not abuse its discretion in denying York's motion for mistrial.

### III. Extrinsic Offense Evidence

Government witness Brenda Finch, former girlfriend of York, testified on direct examination that York had told her that he had tried to bomb the courthouse with a Molotov cocktail he threw at the courthouse basement door. On cross-examination, defense counsel pointed out that when she gave her statement to law enforcement in April 2006 it did not include those words, but rather said something about his having "tried to blow up the courthouse." Finch was subsequently recalled by the Government, and on further direct examination she testified that when orally interviewed by law enforcement a couple of days before her April 25, 2006 written statement she did not "mention to them that Mr. York had told you that he had thrown a Molotov cocktail at the basement of the courthouse." She further testified that she did not then tell law enforcement that "'cause I was scared' because York had 'made threats before with me and my son;" when asked "what specific threats he had made," she responded "he told me that he would kill me and he would kill my son . . . he would kill my son and then kill me . . . he would make me watch." She further

stated that that was also the reason her signed statement to law enforcement did not contain the information that York had shown her how to make a Molotov cocktail. At no time was any defense objection made to any of such testimony (nor is any complaint made of same on appeal). On cross-examination defense counsel asked Finch why, if she was scared because of York's threats, she didn't tell law enforcement about the threats when they orally interviewed her some two days before her written statement, and "if he had made these alleged threats and you are upset, why didn't you go to the police?" Finch answered "I was scared. There were more things involved than that." Defense counsel then asked "Like drug use in your house?" Finch responded that there was no drug use in her house. Defense counsel then asked "How about the CPS [Child Protective Services] issues with your son?" Finch responded "I didn't have no CPS issues with my son." Cross-examination of Finch then concluded as follows:

> "Q. There was alcoholic parties going on for hours at a time, and you had no CPS issues to be concerned about?
>
> A. No.
>
> Q. And that's what you want everybody to believe today?
>
> A. I did not have any CPS issues with my son."

On redirect, Finch repeated her testimony that York's threats, about killing her son and making her watch and then killing her, were the reason she did not disclose certain information mentioned in her earlier testimony when initially questioned by law enforcement, that she perceived those threats to be real, and that that is what she meant when she had said there was more involved than just the threats. And, when asked the reason she believed the threats, she testifed:

> "One night, we was drinking and we got into a fight and he body-slammed me to the ground. As I was trying to make my way towards the door, he pushed me. And I had like one of those porches

15

that had the ceiling on the porch, and my phone cord that they had was hanging down, and he yanked it and wrapped it around my neck. And I think the only thing that saved me was my dad walking out. And it scared me. I just – I knew right then that's the only thing that would – you know, that saved my life."

Defense counsel objected stating "I think it goes beyond the scope of cross. I believe that it's unduly prejudicial and a personal act as opposed go [sic] to any other act." The court overruled the objection stating:

"Your objection is overruled because she was cross-examined on why she didn't put this in her statement. I think the government has a right to bring out why she didn't put it in her earlier statement, because that goes to her credibility. She is testifying to her fear of Mr. York. And that's relevant to rebutting what you brought out in earlier cross-examination."[5]

No limiting instruction was requested by the defense (nor was any defense request made for any other or further ruling) and none was then given. However, a general limiting instruction regarding evidence of prior bad acts was given in the final charge to the jury and no objection to the correctness or adequacy of such instruction has been raised on appeal.

York contends on appeal that his objection to the above quoted testimony concerning York's attempt to strangle Finch with the telephone cord should have been sustained because its admission was a violation of Federal Rule of Evidence 404(b).

This court reviews the admission of evidence under Rule 404(b) for an abuse of discretion. United States v. Cockrell, 587 F.3d 674, 678 (5th Cir. 2009). Although we heighten review in criminal cases, we will only reverse if the defendant can demonstrate prejudice. Id. We apply the two prong Beechum test to resolve 404(b) issues: (a) the "other crimes, wrongs, or acts" must be relevant

---

[5] The defense objection and the court's ruling were made out of the presence of the jury, the court having held, at the request of the prosecution, and out of the presence of the jury a hearing on admissibility. After the ruling the identical testimony was presented to the jury, without further objection or ruling.

to an issue other than the defendant's character; and (b) the evidence's probative value must not be substantially outweighed by its prejudicial effect. Id. (citing United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978).

First, this evidence is clearly relevant to an issue other than York's character, namely the credibility of the Government's witness Finch, as the district court ruled.

Second, it can reasonably be concluded that the Federal Rule of Evidence 403 weighing test favors admission of this evidence. The evidence must possess probative value that is not substantially outweighed by its undue prejudice. Cockrell, 587 F.3d at 678. The court makes a common sense assessment of all the circumstances surrounding the extrinsic offense. Id. The more closely the extrinsic offense evidence resembles the charged offenses, the greater the likely prejudice that results. Id. at 679 (because the jury may use similar offenses for conformity). Here, there is no danger of the jury confusing the domestic violence incident with the charged offense (arson). The evidence has substantial probative force. York's girlfriend explained that she withheld information from the police because she was afraid of York's threats. On cross, York had inquired into many other potential reasons why she may have withheld the information all of which generally impeached her credibility before the jury (e.g., drugs and child custody issues, alcoholic parties). This prior domestic violence incident has substantial probative value in contrast to the reasons the defense proffered.

We are unable to conclude that the district court abused its discretion in the admission of the challenged evidence. It is unlikely that its probative value is substantially outweighed by the unfair prejudicial effect. See United States v. Caldwell, 586 F.3d 338, 342 (5th Cir. 2009).

IV.  Exclusion of Evidence on Relevance Grounds

Fourth, York argues that the trial court should have admitted testimony from York's father about York's birth which led his father to "suspect that Mr. York suffered organic brain damage." In attempting to elicit this testimony, the defense did not ask the father what his profession or education was. The Government objected to relevance and the trial court sustained the objection. This court reviews evidentiary rulings for an abuse of discretion. United States v. Garcia Mendoza, 587 F.3d 682, 689 (5th Cir. 2009). This Court examines what effect the error had or reasonably may be taken to have upon the jury's decision. United States v. George, 201 F.3d 370, 372 (5th Cir. 2000).

Even if proper evidence that York had suffered organic brain damage were relevant, the error was harmless because the defendant merely offered inadmissible opinion. See id. at 373 (affirming based on other grounds). The rules forbid lay opinions based on scientific, technical, or other specialized knowledge within the scope of Rule 702. FED. R. EVID. 701. The drafters added this language to Rule 701 to prevent parties from offering expert testimony as lay opinion and circumventing discovery rules. FED. R. EVID. 701 advisory committee's note. The distinction between lay and expert testimony is that lay testimony results from a process of reasoning familiar in everyday life, whereas expert testimony results from a process of reasoning that can only be mastered by specialists in the field. United States v. Cooks, 589 F.3d 173, 180 (5th Cir. 2009).

The advisory committee notes to Rule 701 adopt the distinctions between lay and expert testimony as set forth in State v. Brown, 836 S.W.2d 530, 549–50 (Tenn. 1992). In Brown one witness testified about the cause of certain bruises and the length of time it would take those bruises to develop. Id. at 549. Another testified about cause of an injury to an individual's toe. Id. The court found both of these medical causation opinions to be expert opinions. Id. at 550.

Like Brown, York's father's testimony seems to be speculative medical causation testimony. Testimony about York's birth and any brain damage caused by his birth requires specialized medical knowledge. It is not the type of opinion that one could reach as a process of everyday reasoning. Thus, district court did not abuse its discretion.

### V. Sentencing

Finally, York challenges the reasonableness of his sentence. York admits that his sentence is within the Guidelines' range. This court reviews a sentence for reasonableness. See Gall v. United States, 552 U.S. 38, 46 (2007). We first decide whether the district court committed any procedural errors, such as incorrectly calculating the advisory guidelines range or failing to consider the sentencing factors set forth in § 3553(a). Here, York makes the argument that "the District Court did not engage in significant and meaningful analysis of any mitigation factors." We assume, arguendo, that this may be construed as a procedural challenge to the sentence. When the district court imposes a sentence within the guidelines, the appellate court may infer that the judge has considered all the factors for a fair sentence. United States v. Smith, 440 F.3d 704, 707 (5th Cir. 2006); see also 18 U.S.C. § 3553(a). Even when the trial court departs from the Guidelines, a checklist recitation of the section 3553(a) factors is not necessary. Smith, 440 F.3d at 707.

It is not shown that the trial court in the instant case failed to adequately weigh the section 3553(a) factors. For example, the court considered the nature and circumstances of the offense and the history and characteristics of the defendant. At sentencing, the trial court explained, "The reason I chose the high end of the guidelines, Mr. York, is because of your violent and assaultive behavior. I understand that you have been diagnosed with a mental disorder." The court further considered the need for the sentence to reflect the

circumstances of the offense, to protect the public from the defendant, and to deter future crimes. The district court stated,

> "What I saw today from the Government is evidence of you assaulting three other inmates. I know you deny that you assaulted Mr. Logsdon, but Oklahoma prison authorities investigated and found that you were responsible for stabbing him. So the court finds that that provides evidence that is sufficiently reliable for the court to base its decision of where to sentence you within the guideline range."

Throughout the record, there is evidence of the district court considering the other section 3553(a) factors. We find no procedural error at sentencing.

Second, the appellate court should consider the substantive reasonableness of the sentence taking into account the totality of the circumstances. Id. Since the sentence in the instant case is within the Guidelines' range, we may apply a presumption of reasonableness. Id. The fact that an appellate court may have reasonably concluded that a different sentence was appropriate is not sufficient to justify reversal of the district court. Gall. v. United States, 552 U.S. at 51. York offers nothing more than conclusory arguments to support his belief that the district court abused its discretion. Here, the district court gave meaningful consideration of the section 3553(a) factors. See United States v. Shannon, 518 F.3d 494, 496 (7th Cir. 2008). The district court gave an adequate statement of its reasons for the sentence. York presents nothing to cause us to depart from the presumption of reasonableness of his sentence.

## CONCLUSION

York raises no point of error based on the record below that warrants reversal of his conviction or his sentence. Accordingly, the judgment of the trial court is

AFFIRMED.