# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-40150

United States Court of Appeals
Fifth Circuit

**FILED**
January 26, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

HABIBOOLA NIAMATALI,

      Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:13-CR-176

Before DENNIS, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:*

      This is an appeal from a jury conviction and sentence for conspiring to distribute, and to possess with intent to distribute, controlled substances under 21 U.S.C. §§ 841, 846. Because we conclude that venue was improper, we reverse, vacate the judgment and remand.

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-40150

## FACTS AND PROCEDURAL HISTORY

Dr. Habiboola Niamatali, a native of Guyana, was a primary-care physician specializing in internal medicine who operated two medical clinics in Garland and Lancaster in the Northern District of Texas. While reviewing pharmacy records, Drug Enforcement Agency (DEA) investigators began noticing Niamatali's name on numerous controlled-substance prescriptions and began an investigation.

DEA Diversion Investigator Susannah Herkert testified that, from 2008-2011, hydrocodone, alprazolam, and promethazine with codeine (cough syrup) accounted for approximately 77 percent of the controlled-substance prescriptions written by Niamatali. Further, Herkert said that Niamatali ranked second in the number of prescriptions written for hydrocodone out of approximately 6,000 DEA registrants in the Dallas area. Herkert said that Niamatali's patients were predominantly African American, often traveled from long distances, including other states, waited in long lines outside his clinics, and often paid cash.[1] Authorities characterized Niamatali's practice as a "pill mill," a facility where prescriptions for controlled substances are typically written for cash and are not issued for legitimate medical reasons.

Two undercover police officers working with the DEA posed as patients and visited Niamatali's clinics a total of seven times. Herkert briefed the officers on how to act and what to say about faked injuries or illnesses to obtain the targeted prescriptions. She also provided one of the officers with a fake document from another doctor regarding a prior knee injury and a driver's license with a fake name, and instructed her to portray an exotic dancer with an ankle injury. The officers were also wired with recording devices, which did

---

[1]However, Herkert also testified that the average travel distance for patients was 22 miles and that most of the patients were coming from local areas surrounding the clinics.

not function properly at least two times and had technical difficulties some other times. Herkert testified that, with the exception of the first visit when one of the officers was turned away for not having documentation from another doctor as a new patient, the visits resulted in prescriptions for either hydrocodone, alprazolam, or promethazine with codeine and were paid for in cash. She said these prescriptions were obtained outside the scope of professional practice and not for medical purposes.

Search warrants were then served on the clinics, the pharmacy next to the Lancaster clinic and Niamatali's residence on June 14, 2011, or June 15, 2011. Authorities seized patient files containing either hydrocodone, alprazolam or promethazine with codeine prescriptions from February of 2010 forward. Herkert said authorities were searching for patient files, documentation related to the drugs in question or cash at Niamatali's home. She said authorities believed Niamatali had a large sum of currency at the house because there had been a traffic stop during the investigation in which Niamatali allegedly pulled an envelope of cash out of his lab coat. Approximately $214,000 was found at Niamatali's house. Some of the cash was bound with rubber bands and some was in envelopes marked with the name of the clinic, the amount of money, the date, the day of the week, and how many patients were seen in the morning or afternoon. Herkert also interviewed Niamatali at his residence the day of the search.

Niamatali acknowledged that his practices were located in high-crime areas, but explained that the hospitals had closed and that it was an underserved area. He had previously worked at the hospital in Garland and had an office attached to the hospital where he maintained a private practice. He later began working at the hospital in Lancaster and also had an office there. He also said that he saw many uninsured blue collar workers who often suffered injuries or illness, could not afford to miss work, and paid in cash or

received Medicare or Medicaid.[2]  He admitted to recently cutting corners in an effort to get his staff out at a reasonable hour.

Eventually, Niamatali surrendered his DEA controlled substance registration pending review, but was still able to practice medicine.  The Texas Medical Board had investigated Niamatali, but had not taken any action to suspend or revoke his license at the time of trial.

Niamatali was subsequently indicted and convicted of conspiracy to possess with the intent to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846.  He was sentenced to 78 months of imprisonment, two years of supervised release, ordered to pay a $50,000 fine and a $100 special assessment, and denied federal benefits for five years.

## DISCUSSION

### I.    Whether the evidence was sufficient to establish venue in the Eastern District of Texas.

This court reviews a venue challenge properly preserved by a motion for judgment of acquittal de novo.  *United States v. Romans*, 823 F.3d 299, 309 (5th Cir. 2016).  The court considers the evidence in the light most favorable to the verdict and "will affirm where a rational jury could conclude that the government established venue by a preponderance of the evidence."  *Id.* (internal marks omitted); s*ee also United States v. Strain*, 396 F.3d 689, 692 (5th Cir. 2005).  In a conspiracy case, "venue is proper in any district where the agreement was formed or an overt act occurred."  *United States v. Caldwell*, 16 F.3d 623, 624 (5th Cir.1994).  An overt act is "performed to effect the object of a conspiracy, although it remains separate and distinct from the conspiracy

---

[2] Niamatali testified that often there was a line when the Medicare van dropped people off and that the van would then pick all of those people up at the same time.

itself." *Romans*, 823 F.3d at 310 (quoting *United States v. Pomranz*, 43 F.3d 156, 160 (5th Cir. 1995)).

In general, "[t]o prove a conspiracy, the government must prove (1) the existence of an agreement between two or more persons to violate the narcotics laws; (2) that each conspirator knew of the conspiracy and intended to join it; and (3) that each alleged conspirator participated in the conspiracy." *United States v. Morris*, 46 F.3d 410, 414-15 (5th Cir. 1995). "Everyone alleged to be part of the same single conspiracy must share a common goal." *Id.* at 415. Specifically with regard to a conspiracy to possess with intent to distribute controlled substances, "[t]he overall objective or goal [is] for everyone in the conspiracy to profit from the illicit purchase and selling of [controlled substances]." *Id.*

Niamatali asserts that the evidence was legally insufficient to prove venue in the Eastern District of Texas and, as a result, the district court erred in denying his motion for a judgment of acquittal. At the close of the government's case-in-chief, Niamatali moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The district court denied the motion. After the defense rested, Niamatali renewed the motion and the court, again, denied it. Specifically, Niamatali asserts that the government failed to prove that his patients were co-conspirators, that he knew they would engage in further distribution, and that he intended and agreed to the shared purpose of further distribution.

Prior to trial, Niamatali submitted a proposed jury instruction saying that, for venue to be proper in the Eastern District, the government was required to show, by a preponderance of the evidence, that "either the agreement or one of the overt acts by the Defendant or by any co-conspirators took place in the Eastern District of Texas."

No. 17-40150

After discussion and outside the presence of the jury, the district court reiterated, "[i]t's got to be an overt act, although not necessarily of a criminal nature, in furtherance of the object of the conspiracy in the district" and "it has to be by a conspirator." The court clarified, "[i]t doesn't have to be by the defendant, or it doesn't have to be by a named conspirator, but it has to be by a conspirator." Also: "It could be initiated, perpetuated [sic] completed in the district, but it's got to be by a conspirator, an overt act."

After the government rested its case, Niamatali moved for a judgment of acquittal, arguing that the government had not proven prescriptions were filled in the Eastern District of Texas by a co-conspirator. The government countered that Herkert "identified three or four specific individuals by name who lived in the Eastern District of Texas, traveled to the defendant's clinics, obtained drugs illegally, came back to the Eastern District of Texas, had the prescriptions filled, and then distributed them in the Eastern District."[3] The government referred to these specifically-named individuals as unindicted co-conspirators and also argued that Niamatali was aware that he had patients from the Eastern District of Texas.[4] Niamatali repeatedly objected to the evidence of these alleged co-conspirators, but the objections were overruled. Herkert also testified that she had interviewed patients who obtained prescriptions from Niamatali's Northern District offices and then gave or sold them to someone in the Eastern District. The district court denied Niamatali's motion for acquittal. However, the district court did include a venue instruction to the jury, which included the following language:

> [T]he government must prove by a preponderance of the evidence that either the agreement or an overt act took place in

---

[3] The government later identified these unindicted co-conspirators as Nancy Diveto, Kelly Dimitra, Garrett Fletcher and Bobby Miller.

[4] Of the 25,000 prescriptions at issue, approximately 1,300 or 1,400 prescriptions were filled by patients who were residents of the Eastern District.

this district, even if the defendant never set foot in the district. An overt act is an act performed to effect the object of a conspiracy, although it remains separate and distinct from the conspiracy itself. Though the overt act need not be of a criminal nature, it must be done in furtherance of the object of the conspiracy.

On appeal, the government now asserts that, because some prescriptions were filled in the Eastern District, illegal drugs were actually delivered there. Thus, the delivery "furthered the object of the crime because the profitability of the conspiracy depended on the illegal distribution of drugs to people who were either addicts or who resold to others."   More importantly, the government now abandons its argument made below that Niamatali's patients were co-conspirators and concedes that there is no evidence of conspiracy between Niamatali and his patients.  To reiterate, Niamatali's objections to testimony alleging unindicted co-conspirator patients were overruled and the government now concedes that the patients were not co-conspirators.

The government cites two cases that contradict its argument below and form the basis for its concession.  In *United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012), this court said:  "The buyer-seller exception prevents a single buy-sell agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs. The rule shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties . . . ."  *Id.* at 333.  This is consistent with at least one other Circuit.  *See United States v. Wexler,* 522 F.3d 194, 208 (2nd Cir. 2008) ("An agreement that one member of a conspiracy supply another with a drug—here by way of writing prescriptions—does not comprise an agreement to distribute that drug.").  The government is correct.  The record fails to establish a conspiracy involving any patient.  Despite its concession, the government maintains that venue is proper in the Eastern District.

No. 17-40150

As stated previously, venue is proper "where the agreement was formed or an overt act occurred." *Caldwell*, 16 F.3d at 624. An overt act is "performed to effect the object of a conspiracy." *Romans*, 823 F.3d at 310. In a conspiracy to possess with intent to distribute controlled substances, the object of the conspiracy is for the co-conspirators to profit from the purchase and selling of controlled substances. *Morris*, 46 F.3d at 415. This court reiterated that in *Romans*, 823 F.3d at 310.

Any conspiracy here must have involved Niamatali and his staff. The object of the conspiracy was the profit derived from the office visits in the Northern District of Texas wherein Niamatali often wrote prescriptions for controlled substances. Niamatali's patients were required to pay prior to their visits because there had been problems with people leaving without paying. There is no evidence that Niamatali or his staff received any profit from patients actually getting prescriptions filled or transferring or selling any controlled substances. There is also no evidence that any patients were part of any agreement or conspiracy. That fact is now conceded by the government. The profit from the office visits was obtained regardless of whether patients actually got any prescriptions filled. Thus, none of the actions of patients after leaving the office was performed to effect the object of the conspiracy.

The government's assertion that "Niamatali knew that the success of the conspiracy depended on addicts getting their fix and coming back for more" is not supported by the record. Herkert testified that surveillance revealed Niamatali worked very long hours. Further, there were potentially thousands of patients whose files were not seized because they received no prescriptions for any of the three targeted drugs and who Niamatali continued to treat up

8

until the time of trial.[5]  Again, one of the undercover officers was not able to get a prescription without prior documentation of injury.  That same officer was also treated for other legitimate medical issues, such as high blood pressure, and had an electrocardiogram performed.  The doctor also tried to steer her toward over-the-counter cough medicine for her cough, but she insisted that she needed promethazine with codeine.  There was also evidence that patients sometimes got angry because Niamatali refused to give them prescriptions after examining them and the police had to be called to the clinic.  Also, Niamatali testified about patients slashing his tires.  Because Niamatali's profit did not depend on patients performing any overt acts in the Eastern District and there was no agreement with the patients, there was no proper venue in the Eastern District.

For these reasons, we conclude that the district court erred in denying Niamatali's motion for judgment of acquittal on the basis of improper venue.  Accordingly, we reverse the ruling, vacate the judgment and remand.  *See Strain*, 396 F.3d at 693, 697; s*ee also United States v. Thomas*, 690 F.3d 358, 368-72 (5th Cir. 2012).  However, upon questioning from the panel at oral argument, defense counsel conceded that this would not necessarily preclude the defendant from being retried.  Thus, we decline to decide whether a judgment of acquittal is the only proper remedy in this instance.  Further, because we reverse the ruling, vacate the judgment, and remand for proceedings consistent with this decision, we find it unnecessary to address the merits of Niamatali's other claims, one of which the Government also concedes.  REVERSED, VACATED and REMANDED WITH INSTRUCTIONS.

---

[5] Niamatali testified dout that he was still seeing on average about 30 patients per day at the time of trial, which was years after he surrendered his controlled substance registration and was no longer writing prescriptions for controlled substances.